# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

01 OCT 19 PH 2: 37

᠁ ᠁ COURT
H.D. OF ALABAMA

RICHARD KIM BOYER,     ]
                      ]
     Plaintiff(s),     ]
                      ]
     vs.             ]     CV-01-N-0422-S
                      ]
W.S. NEWELL & SONS, INC., ET     ]
AL.,                 ]
                      ]
     Defendant(s).     ]

**ENTERED**

OCT 1 9 2001

### Memorandum of Opinion

## I.    Introduction

The court has for consideration the following motions: defendant Barber Vintage Motorsports Museum's motion to dismiss, filed June 15, 2001 (Doc. # 21); defendant W.S. Newell & Sons, Inc.'s motion to dismiss and alternative motion for summary judgment, filed June 15, 2001 (Doc. # 23); and defendant Jefferson County's[1] renewed motion to dismiss, filed June 19, 2001 (Doc. # 30). The issues have been briefed by all parties and are now ripe for decision. Upon due consideration, the motions will be granted.

---

[1] Plaintiff has sued both Jefferson County and the Jefferson County Roads & Transportation Department. In its motion to dismiss, Jefferson County argued that Jefferson County Roads & Transportation Department is merely an operating division of Jefferson County and is therefore not subject to suit. Apparently, plaintiff does not dispute this because he failed to respond to this argument in his response to the motion to dismiss. Indeed, plaintiff himself referred to the County and the Department collectively throughout his complaint. (*See* Complaint at ¶ 11.) Regardless, the court cannot envision how the outcome of the case would differ if the Department was separately sueable because there is no difference under the facts of this case and the law applicable thereto that would merit a different result between the County and the Department. Thus, the court refers collectively to Jefferson County and the Department as "Jefferson County."



## II.    Facts

Plaintiff and his family reside at and own property that abuts the Cahaba River. (Complaint at ¶ 15.)  Plaintiff brought this action pursuant to the citizen suit provision of the Clean Water Act, 33 U.S.C.A. § 1365 (2001).  (Complaint at ¶ 1.)  The plaintiff's allegations concern the development by W.S. Newell & Sons, Inc. ("Newell") and Jefferson County of certain land in Jefferson County, Alabama, (the "Site") leased by Barber Vintage Motorsports Museum ("Barber") and the effects of that development on the Cahaba River. (Complaint at ¶ 15.)

Barber is in the process of constructing on the site a motorsports museum and racetrack. (Ray Aff. at ¶¶ 2, 5.)  Barber has not applied for and does not hold a National Pollutant Discharge Elimination System (NPDES) permit to discharge pollutants into the waters of the United States from the Site.  (*Id.* at ¶ 4.)  On or about July 20, 2000, Barber contracted with defendant W.S. Newell & Sons, Inc. as an independent contractor for the construction of a racetrack and associated improvements at the Site.  (*Id.* at ¶ 5; Hall Aff. at ¶ 3.)  Pursuant to its independent contractor agreement with Newell, Barber did not have the right to control the means and methods by which Newell would perform work at the Site, and had not exercised any such control at any time.  (Ray Aff. at ¶¶ 9, 10.)

### A.    Newell's Activities at the Site

On or about July 21, 2000, Newell submitted to the Alabama Department of Environmental Management ("ADEM") its Notice of Intent seeking coverage under the state's General Stormwater Permit for its construction activities at the Site.  (Hall Aff. at ¶ 4.)

On or about September 8, 2000, ADEM granted Newell authorization to discharge pollutants from the Site pursuant to Permit No. ALG610000, authorization number ALR105426. (*Id.* at ¶ 5.) The Permit regulated Newell's discharges from the construction site and imposed various limitations and monitoring requirements. (*Id.*) The Permit contained a number of requirements that were not measured objectively. For example, the Permit (i) prohibited the Newell from discharging pollutants such as to cause a "substantial visible contrast" in the receiving waters, and (ii) required each discharger to implement and maintain "appropriate" structural and non-structural practices and management strategies known as Best Management Practices ("BMPs"). (*See* Permit at Parts I.A.3.a, II.B.2.a.) BMPs include the use, consistent with good engineering judgment, of a combination of diverse features such as hay bales, silt fences, diversion ditches, check dams, retention ponds, rip-rap and similar measures in a manner designed to control erosion and sediment discharge to acceptable levels. (*Id.* at Part II.B.2(b).) The Permit contains only one objective, numeric standard concerning discharges. Namely, it prohibits discharges which "cause instream turbidity to exceed background or upstream turbidity by more than 50 n.t.u." ("n.t.u." stands for nephelometric turbidity unit and is a standard unit used for comparing the opaqueness of liquids). (*Id.* at Part I.A.3.a.) The Permit contains no numeric standard or limitation stated in terms of "quantities, rates and concentrations" for any other metric, including, for example, Total Suspended Solids ("TSS"), Settled Solids ("SS"), or Silt/Sand/Clay/Dirt. (*See* Permit.)

On or about October 5 and 10, 2000, ADEM conducted an inspection of Newell's construction site; ADEM also conducted sampling activities at the Site on October 6, 2000.

3

(Ray Aff. at ¶ 22; Hall Aff. at ¶ 6.)  Based on these initial inspections, ADEM issued a notice of violation ("NOV") to Newell, dated October 12, 2000.  (ADEM Notice of Violation.)  The NOV was issued pursuant to ALA. CODE § 22-22-9(e) (1975), which provides the framework by which the Alabama Environmental Management Commission (the "Commission"), acting through ADEM, enforces the provisions of the Alabama Water Pollution Control Act, including the conditions of NPDES permits.  (*Id.*)  Specifically, the NOV addressed deficiencies observed on October 6-10, 2000, with regard to Newell's BMPs and violations of the state water quality standard for turbidity.  (*Id.*)  In addition to identifying alleged violations, the NOV required Newell to submit a full report to ADEM within seven days, "showing the steps that have been taken and are being taken to correct all deficiencies/violations." (*Id.*)  The NOV also stated that ADEM would conduct a follow-up inspection and periodic inspections thereafter to monitor Newell's discharges. (*Id.*)  Lastly, the NOV informed Newell that ADEM would seek monetary penalties for the violations and invited Newell to discuss the issue of penalties.  (*Id.*)

ADEM collected discharge samples on October 6, 2000, and November 9, 2000, and found that stormwater runoff from the construction site exceeded Newell's Permit limits. (Newell Consent Order at ¶ 4.)  ADEM further found, during an inspection on November 8, 2000, that although Newell had BMPs in place, these BMPs were "inadequate." (*Id.* at ¶ 5.)

As a result of the October and November inspections,[2] Newell and ADEM began

---

[2]ADEM conducted further inspections of Newell's construction site on or about the following dates: November 8, 9, 16, and 30, 2000; December 14 and 28, 2000; January 4, 11, 19, 26 and 30, 2001; February 9, 13, 14, 15, 16, 17, 20 and 22, 2001; March 1, 6, 9 and 12, 2001; April 12, 2001; May 1 and 16, 2001; and June 13, 2001. (Ray

discussions regarding resolution of the alleged violations. (Hall Aff. at ¶ 7.) Based on these discussions, Newell received a proposed Consent Order from ADEM on November 30, 2000. (*Id.* at ¶ 8.) The enforcement action culminated in the issuance of Consent Order No. 01-0220CMNPS issued to Newell on December 14, 2000. (*See* Newell Consent Order.) The December 14, 2000, Consent Order required Newell to conduct a variety of activities to ensure stormwater runoff was controlled. (*Id.* at ¶¶ B-E.) Importantly, pursuant to the terms of the Consent Order, Newell paid a fine of $15,000 for the alleged past violations. (Hall Aff. at ¶ 11.) The Consent Order addressed activities occurring between September 8, 2000, and December 14, 2000, and resolved all violations of the stormwater program which may have occurred during that period. (Newell Consent Order at ¶ 7; ¶ L.) In addition, the Consent Order contained stipulated penalties for any future (*i.e.*, after December 14, 2000) violations of $500.00 per day for the first thirty days following the violation and $1,000 per day thereafter, with a maximum amount of $15,000. (*Id.* at ¶ F.)

### B.   Jefferson County's Activities at the Site

In 1999, Jefferson County agreed, as an economic development incentive, to construct a lake at the Site. (Ray Aff. at ¶ 15.) Barber had no reasonable means of control over the means and methods by which Jefferson County would perform its work at the Site, nor did Barber exercise such control. (*Id.* at ¶ 16; Sullivan Aff. at ¶ 4.) Barber was not responsible for providing pollution control protection measures for Jefferson County's construction activities at the County's construction site. Rather, the County was responsible

---

Aff. at ¶ 23.) ADEM also conducted further sampling activities at the Site on the following dates: November 8, 9 and 16, 2000; December 13, 2000; January 19, 2001; February 9, 13, 14, 15, 16, 17 and 20, 2001; and March 1, 6, 9 and 12, 2001. (Ray Aff. at ¶ 24.)

for providing its own pollution control protection measures at the Site. (Sullivan Aff. at ¶ 6.) Unlike Newell, Jefferson County did not possess an NPDES permit for many of its activities. (Jefferson County Consent Order at ¶ 4.)

Jefferson County began clearing activities for dam foundation geological investigation at the Site during the last week of September 2000. (Sullivan Aff. at ¶ 8.) On or about October 5 and 10, 2000, ADEM conducted an inspection of Jefferson County's construction site.[3] (Ray Aff. at ¶ 22; Sullivan Aff. at ¶ 9.) Immediately thereafter, on October 12, 2000, ADEM notified Jefferson County that it had violated the Clean Water Act through the issuance of a Notice of Violation. (Sullivan Aff. at ¶ 10; Jefferson County Notice of Violation) A meeting was then convened between ADEM and Jefferson County at which ADEM informed the County that immediate pollution control steps would have to be taken, that it would be cited for violations of the Clean Water Act, and that it would be fined $15,000. (Sullivan Aff.) On or about October 24, 2000, Jefferson County submitted to ADEM its Notice of Intent seeking coverage under the state's General Stormwater Permit for its construction activities at the Site. (Sullivan Aff. at ¶ 7.) ADEM and Jefferson County thereafter entered into a Consent Order similar to the Consent Order entered into between ADEM and Newell. (*See* Jefferson County Consent Order.)

Consent Order No. 01-021-CMNPS, issued to Jefferson County on December 8, 2000, required Jefferson County to conduct a variety of activities to ensure stormwater runoff was

---

[3] ADEM conducted further inspections of the County's construction site on or about the following dates: November 8, 9, 16, and 30, 2000; December 14 and 28, 2000; January 4, 11, 19, 26 and 30, 2001; February 9, 13, 14, 15, 16, 17, 20 and 22, 2001; March 1, 6, 9 and 12, 2001; April 12, 2001; May 1 and 16, 2001; and June 13, 2001. (Ray Aff. at ¶ 23.) ADEM also conducted further sampling activities at the Site on the following dates: November 8, 9 and 16, 2000; December 13, 2000; January 19, 2001; February 9, 13, 14, 15, 16, 17 and 20, 2001; and March 1, 6, 9 and 12, 2001. (Ray Aff. at ¶ 24.)

controlled. (*See* Jefferson County Consent Order at ¶¶ C-F.)  Importantly, as with Newell, the Consent Order required Jefferson County to pay a fine of $15,000 for the alleged past violations. (*Id.* at ¶ A.)  The Consent Order addressed activities occurring between the beginning of Jefferson County's work at the Site and the issuance of the Consent Order, and resolved all violations pertinent to this lawsuit that may have occurred during that period. (*Id.* at ¶¶ 4-10, M.)  In addition, the Consent Order provided that ADEM may further prosecute an action or issue additional orders against Jefferson County for failure to comply with the Consent Order. (*Id.* at ¶¶ K-M.)

**C.     The Present Action**

In November 2000, plaintiff sent the defendants a "notice" letter that informed them of his intent to file suit under the Clean Water Act ("CWA"). (Complaint at Exs. A, B.)  On February 15, 2001, Plaintiff filed the present action. (*See* Complaint.)  In his complaint, plaintiff alleges that Newell violated its Permit by failing to prevent silt, sand, clay, and dirt from discharging into the Cahaba River and its tributaries. (Complaint at ¶ 14, 18.) Plaintiff alleges that Barber and Jefferson County violated the CWA by discharging pollutants into the Cahaba River or its unnamed tributary without a permit. (*Id.* at ¶ 16.)  The Complaint specifically alleges that all three defendants have failed to utilize adequate erosion and stormwater runoff control measures; failed to inspect and monitor their discharges; failed to notify the Director of ADEM of discharges and their noncompliance with the CWA; failed to employ Best Management Practices; and failed to mitigate adverse impacts on the environment. (Complaint at ¶¶ 16, 18.)  The Complaint then alleges a series of claims sounding in common law trespass, nuisance, and negligence and/or wantonness.

7

(Complaint at ¶¶ 21-23.)  Plaintiff seeks declaratory, injunctive, compensatory, and punitive relief, along with attorney's fees.  (Complaint at ¶¶ a-h.)

## III.   Standard

### A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*quoting* Rule 56(c), Fed. R. Civ. P.).  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (*quoting* Rule 56(e), Fed. R. Civ. P.).

After the plaintiff has properly responded to a proper motion for summary judgment,

the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed. R. Civ. P.  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### B.   Dismissal for Lack of Subject Matter Jurisdiction Standard.

A motion to dismiss pursuant to Rule 12(b)(1), Fed. R. Civ. P., raises the question of the federal court's subject matter jurisdiction, which may be inquired into at any time during the proceedings.  Rule 12(b)(1), Fed. R. Civ. P.; *Fitzgerald v. Seaboard System R.R., Inc.*, 760 F.2d 1249 (11th Cir. 1985); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).  The motion can be based on either of two defects. *Williamson v. Tucker*, 645 F.2d 404, 412-13 (5th Cir. May 20, 1981).  If the motion to dismiss is based on the face of the

complaint, the court is "merely to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Menchaca*, 613 F.2d at 511.  On the other hand, "a 'factual attack' . . . challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.*  In the case of a "factual attack," "no presumptive truthfulness attaches to plaintiff's allegations and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990) (*quoting Williamson*, 645 F.2d at 413).  When the attack is based on the facts, "plaintiff bears the burden of proof that jurisdiction does in fact exist." *Menchaca*, 613 F.2d at 511.

## IV.    Discussion

### A.    The Clean Water Act

Plaintiff relies on the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387 (2001), as the basis of federal subject matter jurisdiction in this case.  The CWA was enacted in 1972 "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." § 1251(a).  Specifically, the CWA prohibits the discharge of pollutants into navigable waters, except as authorized by, *inter alia*, the National Pollutant Discharge Elimination System ("NPDES"), which the CWA itself created.  §§ 1311(a), 1342.  Under the NPDES, the Administrator of the Environmental Protection Agency is allowed to issue permits to individuals and corporations authorizing the permit holder to discharge pollutants in accordance with specific conditions. § 1342(a).  The CWA allows each state to develop and

10

administer its own permit program, provided the Administrator approves the program and it adheres to certain federal guidelines. § 1342(b).

While the holder of a federal NPDES permit is subject to enforcement by the Administrator of the EPA, the holder of a state NPDES permit is subject to enforcement by both the Administrator and the state that issued the permit. §§ 1319, 1342(b)(7). The Act allows private citizens to bring suit to enforce both federal and state permits when neither the Administrator nor the state has enforced the provisions of a permit. § 1365(a)(1). Such a suit may be filed no less than sixty days after the citizen has given notice to the permit holder of the alleged violation upon which the citizen intends to file suit. § 1365(b). A private citizen who prevails in a citizen suit may seek injunctive relief and the imposition of civil penalties against the permit holder. § 1365(a).

Private citizens are not permitted to enforce the provisions of the Act for wholly past violations. *See Gwaltney v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 59-63 (1987). Instead, to have standing to sue a permit holder for failure to follow its permit, a citizen must allege in good faith "a state of either continuous or intermittent violation -- that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id.* at 64-66. Citizens are likewise precluded from bringing suit under the CWA when the Administrator or state has commenced and is diligently prosecuting an action for administrative penalties or has issued a final order in regard to administrative penalties. 33 U.S.C. § 1319(g)(6)(A)(ii)-(iii) (2001). This preclusion does not operate to bar a citizen suit, however, if the citizen gave notice of the alleged violation to the permit holder prior to the commencement of the administrative action and filed suit no less than sixty days nor more

231f807ee24fc587

than 120 days after giving such notice.  § 1319(g)(6)(B).

### B.     Defendant Newell's Motion for Summary Judgment

In its motion to dismiss and alternative motion for summary judgment, Newell raises a number of issues. It argues that the plaintiff failed to provide adequate notice of its intent to sue under the citizen suit provision of the Clean Water Act, depriving this court of jurisdiction.  *See* 33 U.S.C. § 1365(b).  Alternatively, Newell argues that this court should grant summary judgment because the Alabama Department of Environmental Management's enforcement action and final order bar the plaintiff's suit under the Clean Water Act. *See* § 1319(g)(6)(A)(ii)-(iii).  Newell further asserts that the plaintiff cannot base its complaint upon the defendant's alleged violation of subjective criteria in the defendant's NPDES permit.  Finally, Newell argues that the plaintiff's state law claims are due, upon the dismissal of the plaintiff's Clean Water Act claim, to be dismissed for lack of pendant jurisdiction, or, alternatively, on the merits.

The court finds that plaintiff provided adequate notice of its intent to sue under § 1365(b).  However, the court also finds that the consent order entered into by ADEM and Newell effectively bars plaintiff's claim under the CWA. *See* § 1319(g)(6)(A)(iii).  Because the CWA forms the basis of federal subject matter jurisdiction in this case, the court finds that the pendant state law claims are due to be dismissed as well.  *See* 28 U.S.C. § 1367(c)(3) (2001).  In so finding, the court does not reach the other grounds of Newell's motion.

### 1.     Plaintiff's Notice of Suit

In order to bring a citizen suit under the CWA, a would-be plaintiff must give notice

of its intent to sue at least sixty days before it files suit to the proposed defendant, the EPA, and the state. § 1365(b)(1)(A). The purpose of providing notice to the defendant is to give that defendant "an opportunity to bring itself into compliance with the Act and thus likewise render unnecessary a citizen suit." *Gwaltney v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60 (1987). The purpose of providing notice to the EPA and the state "is to allow them to commence their own actions." *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1131 n.4 (11th Cir. 1990). A plaintiff cannot file suit if it fails to provide the mandatory sixty-days notice required by the CWA. *See National Environmental Foundation v. ABC Rail Corp.*, 926 F.2d 1096, 1097 (11th Cir. 1991).

The Administrator of the EPA prescribes the form and requisites of the notice that a plaintiff must provide in the Code of Federal Regulations. *See* 33 U.S.C. § 1365(b); 40 C.F.R. § 135.3. The pertinent regulation states in relevant part:

> § 135.3 Contents of notice.
> (a) Violation of standard, limitation or order. Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.
> . . .
> (c) Identification of counsel. The notice shall state the name, address, and telephone number of the legal counsel, if any, representing the person giving notice.

40 C.F.R. § 135.3. Although the Eleventh Circuit has not interpreted 40 C.F.R. § 135.3, other courts have disagreed over the level of specificity that a plaintiff must include in its notice of intent to sue. *Compare Atlantic States Legal Foundation v. Stroh Die Casting Co.*, 116

13

F.3d 814, 820 (7th Cir. 1997) ("The key to notice is to give the accused company the opportunity to correct the problem."); *Public Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1247-48 (3rd Cir. 1995) ("The district court . . . placed the burden on the citizen to identify every pre-complaint date on which there was an excess discharge of a designated pollutant. While there is no doubt that such detailed information is helpful to the recipient of a notice letter in identifying the basis for the citizen suit, such specificity is not mandated by the regulation. The regulation does not require that the citizen identify every detail of a violation.  Rather, it states that '[n]otice regarding an alleged violation . . . shall include sufficient information to permit the recipient to identify' the components of an alleged violation. 40 C.F.R. § 135.3(a) (emphasis added).  We read the regulation to require just what it says . . . ."); *Friends of Frederick Seig Grove #94 v. Sonoma County Water Agency*, 124 F. Supp. 2d 1161, 1169 (N.D. Cal. 2000) ("[A] plaintiff is not required to provide in the notice letter itself an exhaustive list of each and every violation and the corresponding dates.  Instead, a plaintiff must do what the CWA regulation requires: provide enough information for a defendant to identify the dates of claimed violations. When the plaintiff has gathered the information supporting its suit from the defendant's own submissions to the relevant state agencies and cites those submissions in the notice letter, the plaintiff has satisfied the notice requirement, and a district court possesses subject matter jurisdiction over the case.") *with Frilling v. Village of Anna*, 924 F. Supp. 821, 833 (S.D. Ohio 1996) ("[P]laintiffs bringing suit under 33 U.S.C. § 1365 must provide notice of the specific limitations, standards, or orders alleged to be violated."); *California Sportfishing Protection Alliance v. West Sacramento*, 905 F. Supp. 792, 799 (E.D. Cal. 1995) ("[T]he strict approach

taken by the Ninth Circuit appears most consistent with the purpose of the notice provision, the language of the regulation, and the structure of the statute.").

The court agrees with the flexible approach employed by the Third and Seventh Circuits, finding that a plaintiff, when providing notice of intent to sue, need only present the recipient with sufficient information whereby the recipient itself is able to identify the violation, the activity causing the violation, who is responsible for the violation, the location and date of the violation, and the plaintiff's contact information. The regulation clearly does not require a plaintiff to actually identify these items for the recipient. The court notes that this approach to determining the requirements of the regulation is in keeping with recent pronouncements by this district on the issue. *See Franklin v. Birmingham Hide and Tallow Co., Inc.*, 1999 U.S. Dist. LEXIS 22489, *37-38 (N.D. Ala. 1999) (Buttram, J.).

In his notice, the plaintiff noted that Newell was violating the Federal Water Pollution Control Act, the Alabama Water Pollution Control Act, and Part I, A of its NPDES Permit. (Complaint, Ex. A at 1.) The plaintiff pointed out the dates that stormwater caused the runoff of certain pollutants into the Cahaba River or one of its unnamed tributaries and identified these pollutants. (*Id.* at 1-2.) Plaintiff further pointed out that this runoff specifically violated Newell's NPDES permit by causing "substantial visible contrast and/or interfer[ing] with the beneficial use of the waters referenced herein." (*Id.* at 2.) Plaintiff then put Newell on notice that he also intended to sue for any discharges of pollutants that violated the permit and were noted in the reports that Newell submitted to ADEM. (*Id.*) The notice contained the name, address, and telephone number of counsel for plaintiff, the name of the plaintiff, and a statement that the plaintiff could be contacted through his attorney. (*Id.* at 1-2.)

15

Clearly, the plaintiff provided sufficient information in his notice of intent to sue to Newell regarding most of the violations upon which he subsequently brought suit. The court finds that from the information provided, Newell could determine for itself the violation complained of and how it was caused, that Newell itself was responsible for the violation, the location and date of the violation, and the plaintiff's contact information. The court again notes that the plaintiff is under no obligation to provide this information to the defendant. It is only required to provide sufficient facts to enable the defendant to determine this information for itself. *See Hercules*, 50 F.3d at 1247-48.

Newell argues that the notice of intent to sue did not include sufficient information to cover any alleged violations in regard to its use of Best Management Practices ("BMPs"). Indeed, as Newell points out, the notice does not even indicate that a violation exists with respect to BMPs. (Complaint, Ex. A at 1-2.) The only reference in the notice regarding BMPs is that plaintiff's complaint "will request that the Court require Barber and Newell to comply with all Best Management Practices for land disturbance and construction and comply with any plan for mitigation of stormwater runoff." (*Id.* at 2.) Noting that it has jurisdiction only over those violations that are noticed in the intent to sue letter or are directly related to violations that are noticed, *see Hercules*, 50 F.3d at 1251-52, the court finds that the portions of the plaintiff's complaint regarding Newell's failure to employ BMPs are due to be dismissed. *Cf. National Environmental Foundation v. ABC Rail Corp.*, 926 F.2d 1096, 1097 (11th Cir. 1991). Specifically, the court does not have jurisdiction over the portions of ¶18 of plaintiff's complaint that complain of defendant's failure to employ BMPs. (*See* Complaint at ¶18.)

16

## 2.   Preclusion of Citizen Suits Under 33 U.S.C. § 1319(g)(6)(A)(iii)

Although the court finds that the plaintiff's notice of suit was sufficient under the

Clean Water Act to withstand a motion to dismiss as to most of plaintiff's complaint, the

plaintiff's Clean Water Act claim is barred by § 1319(g)(6), which reads in pertinent part:

(A)  Limitation on actions under other sections

[A]ny violation–

. . .

(iii)  for which ... the State has issued a final order not subject to judicial review and the violator has paid a penalty assessed under this subsection, or such comparable state law, as the case may be, shall not be the subject of a civil penalty action[4] under ... section 1365 [the citizen suit provision] of this title.

(B)  Applicability with respect to citizen suits
The limitations contained in subparagraph (A) on civil penalty actions under section 1365 of this title shall not apply with respect to any violation for which–

. . .

(ii)  notice of an alleged violation of section 1365(a)(1) of this title has been given in accordance with section 1365(b)(1)(A) of this title prior to commencement of an action under this subsection and an action under section 1365(a)(1) of this title with respect to such alleged violation is filed before the 120th day after the date on which such notice is given.

33 U.S.C. § 1319(g)(6).  This provision raises a number of issues, most of which are not

_____

[4] Neither party has addressed whether the § 1319(g)(6)(A) bars forms of relief other than civil penalties. Although the Eleventh Circuit has not addressed this issue, two other circuits have held that the preclusion of citizen suits under § 1319(g)(6)(A) bars all forms of relief, including injunctive and declaratory relief. *See Ark. Wildlife Fed. v. ICI Americas, Inc.*, 29 F.3d 376, 382-83 (8th Cir. 1994); *North and South Rivers Watershed Assoc. v. Scituate*, 949 F.2d 552, 557-58 (1st Cir. 1991). *But see Orange Environment, Inc. v. County of Orange*, 860 F. Supp. 1003, 1017-18 (S.D.N.Y. 1994); *Sierra Club v. Hyundai America, Inc.*, 23 F. Supp. 2d 1177, 1179-80 (D. Or. 1997). The court finds applicable to the present lawsuit the policy reasons cited by the First and Eighth Circuits for extending the bar on civil penalties under § 1319(g)(6)(A) to all forms of relief under citizen suits, including the Supreme Court's statement in *Gwaltney* that the role of citizen suits is to supplement rather than supplant enforcement of the CWA by the federal and state governments, *see Gwaltney*, 484 U.S. at 60, the close relationship of civilian penalty and injunctive actions within the statutory scheme, and the fact that "allowing suits for declaratory and injunctive relief in federal court, despite a state's diligent efforts at administrative enforcement, could result in undue interference with, or unnecessary duplication of, the legitimate efforts of the state agency." *Ark. Wildlife Fed.*, 29 F.3d at 383; *see Scituate*, 949 F.2d at 557-58. The court therefore finds that the § 1319(g)(6)(A) bar to citizen suits applies to all forms of relief available, not just civil penalties.

contested by the plaintiff, that this court must address to determine if it bars the plaintiff's claim under the CWA. These issues include whether the consent order issued by ADEM is a "final order not subject to judicial review"; whether the state statute under which Newell paid $15,000 is comparable to the federal provision regarding administrative penalties; and whether the plaintiff gave notice of suit to Newell prior to ADEM's commencement of the action that resulted in the consent order.

### a.     Finality of the Consent Order

By its terms, the consent order is "considered final" by both ADEM and Newell, and is not appealable. Newell Consent Order at ¶ M. Besides requiring Newell to perform a number of tasks and submit to a number of inspections, the consent order requires it to pay $15,000 "in full and final settlement" of its past violations. *Id.* at ¶ A. Further, the order puts in place a structure whereby Newell is to be fined for every future violation of the NPDES. *Id.* at ¶ F. The plaintiff does not contest the fact that the consent order is a "final order" as contemplated by § 1319(g)(6)(A)(iii), nor does the court find any authority to the contrary. Thus, the court finds the consent order to be a "final order" as contemplated by § 1319(g)(6)(A)(iii).

### b.     Comparability of State and Federal Statutes

This court has previously held that Ala. Code § 22-22A-5(18), the state statute under which ADEM assessed Newell $15,000 and presently retains the authority to fine it for violations of its NPDES permit, is comparable to 33 U.S.C. § 1319(g). *See Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 682 F. Supp. 1186, 1187 (N.D. Ala. 1988) (Guin, J.). A number of cases since that time have examined the requirement that the state statute

18

under which a state proceeds be comparable to § 1319(g), requiring different levels of proximity. *See, e.g., Arkansas Wildlife Federation v. ICI Americas, Inc.*, 29 F.3d 376, 381-82 (8th Cir. 1994); *North and South Rivers Watershed Assoc., Inc. v. Scituate*, 949 F.2d 552, 555-56 (1st Cir. 1991); *Saboe v. Oregon*, 819 F. Supp. 914, 917 (D. Or. 1993); *Public Interest Research Group of New Jersey, Inc. v. GAF Corp.*, 770 F. Supp. 943, 949-51 (D.N.J. 1991); *Atlantic State Legal Foundation, Inc. v. Universal Tool and Stamping Co., Inc.*, 735 F. Supp. 1404-1415-14 (N.D. Ind. 1990).

This court agrees with the District Court of Oregon that "[c]omparable state law, as used in § 1319(g)(6), does not mean that the state's regulatory authority or processes must be identical to the federal provisions," *Saboe*, 819 F. Supp. at 917, and, for the following reasons, finds that the statute under which ADEM proceeded against Newell and assessed a civil penalty against it is comparable to 33 U.S.C. § 1319(g). The Alabama Environmental Management Act, Ala Code §§ 22-22A-1 to -16, allows ADEM to assess penalties in excess of $100,000, calls for public notice of all orders assessing civil penalties, requires ADEM to take certain criteria similar to that found in 33 U.S.C. § 1319(g) into account when determining the amount of a penalty to assess, entitles "any person aggrieved by an administrative action" of ADEM to a hearing before the Environmental Management Commission, allows an appeal of the Environmental Management Commission's decision to state circuit court, and allows for recovery of unpaid penalties by ADEM in circuit court. *See* Ala. Code §§ 22-22A-1 to -16 (2000). These provisions are similar to 33 U.S.C. § 1319(g), in that 33 U.S.C. § 1319(g) allows for administrative penalties, calls for the enforcement of unpaid penalties by the Attorney General, requires the Administrator of the EPA to consider

19

factors similar to those found in the Alabama Environmental Management Act when determining the amount of a penalty, and allows persons subjected to civil penalties an appeal to federal district or circuit court. 33 U.S.C. § 1319(g). Although the court notes that there is a difference between 33 U.S.C. § 1319(g) and the Alabama Environmental Management Act to the extent that the public is allowed to comment on proposed orders to be issued under 33 U.S.C. § 1319(g) prior to their issuance, the court agrees with the First Circuit that "[s]o long as the provisions in the State Act adequately safeguard the substantive interests of citizens in enforcement actions, the rights of notice and public participation found in the State Act are satisfactorily comparable to those found in the Federal Act." *Scituate*, 949 F.2d at 556 n.7. The court finds that the Alabama statute adequately safeguards the substantive interests of citizens in ADEM enforcement actions by providing for public notice and the opportunity of any person aggrieved by an administrative action of ADEM to a hearing before the Environmental Management Commission and subsequent appeal to state circuit court. Thus, the Alabama statute under which ADEM proceeded against the defendant is comparable to 33 U.S.C. § 1319(g).

### c.   **Commencement of ADEM's Action**

Although the preceding discussion demonstrates the applicability of 33 U.S.C. § 1319(g)(6)(A)(iii) to the present lawsuit, § 1319(g)(6)(B) limits the applicability of the bar to citizen suits when, *inter alia*, the plaintiff has given notice to the defendant of its intent to file a citizen suit under § 1365 prior to the commencement of the state's enforcement action against the defendant. § 1319(g)(6)(B)(ii). Accordingly, the plaintiff's claim in the present

20

lawsuit under the CWA is not barred by § 1319(g)(6)(A)(iii)[5] if he gave notice to Newell of his intent to file a citizen suit prior to the commencement of ADEM's enforcement action.

In order to determine the time at which ADEM commenced its action for purposes of the bar to citizen suits, the court looks to the state provisions under which ADEM instituted the administrative action against Newell that culminated in the consent order. *See Sierra Club v. Colorado Refining Co.*, 852 F. Supp. 1476, 1485 (D. Colo. 1994); *Public Interest Research Group of New Jersey, Inc. v. Elf Atochem North America, Inc.* 817 F. Supp. 1164, 1172 (D.N.J. 1993). The relevant state statute, Ala. Code § 22-22A-5(18), provides that "[a]n order shall not be issued under this paragraph until the person subject thereto has been afforded an opportunity for an informal conference with the director or his designated representative concerning the alleged violation and penalty assessment." Ala. Code § 22-22A-5(18). Thus, to issue an order, ADEM is required to first give the object of the proposed order an opportunity for a conference regarding its violations and the penalty. Clearly, ADEM intended the notice of violation that it sent to the defendant to serve this purpose, as it required the defendant to "call Mr. James M. Boyle, at the Birmingham Branch Office . . . to schedule a meeting to discuss" ADEM's formal enforcement action and the assessment of monetary penalties. (Newell Notice of Violation at 3.) Moreover, the notice of violation issued by ADEM is vastly different from the sorts of notices of violation that warn of possible administrative action in the future and that some courts have held do not serve

---

[5] In his response to the defendant's motion to dismiss and, alternative motion for summary judgment, the plaintiff argued that the bar to citizen suits is inapplicable "when the Plaintiff provides notice of the violations *prior to the administrative action*, and Plaintiff commences an action within 120 days of giving such notice." Pla.'s Br. at 6 (emphasis added). This is incorrect. The relevant date is not when the administrative action is finally taken, but when it is "commenced." *See* § 1319(g)(6)(B)(ii).

to commence an administrative action. *See, e.g., Public Interest Research Group of New Jersey v. New Jersey Expressway Authority*, 822 F. Supp. 174, 184 n.13 (D.N.J. 1992); *Elf Atochem North America*, 817 F. Supp. at 1172-73.   Instead of merely threatening some possible future action on the part of ADEM, the notice of violation in the present lawsuit required immediate actions on the part of Newell,[6] informed it that ADEM was going "to pursue a formal enforcement action, including the imposition of monetary penalties," and required it to contact ADEM within a week of receipt of the letter to discuss the formal enforcement action and penalties that ADEM was going to impose, an opportunity that, as noted above, ADEM was required to offer to Newell before it could seek civil penalties.

---

[6]Specifically, the notice of violation required the defendant to submit a detailed report, prepared by a "qualified credentialed professional" to ADEM that, at a minimum, included:

> 1.  Updated comprehensive BMP plan detailing the temporary/permanent, effective structural/nonstructural practices to be implemented and maintained to the maximum extent practicable that meet the requirements of EPA's *Storm Water Management For Construction Activities - Developing Pollution Prevention Plans And Best Management Practices* document, as amended, to ensure protection of groundwater and surface water quality.
> . . .
> 2.  A detailed plan for the stabilization and/or removal of sediment and other pollutants deposited offsite and in State waters.
> 3.  A description of any increase in acreage, or change in operations that could increase or change the characteristics of stormwater runoff from this facility.
> 4.  Proposed, detailed compliance schedule, with all work to be completed by November 30, 2000, or a Department approved alternative date.

Notice of Violation at 2-3.   The notice of violation also required the defendant to perform the following acts:

> 1.  Implement measures to ensure temporary revegetation or cover of all disturbed areas where active construction has not taken place in the previous 14 days.
> 2.  Ensure that all construction debris ... and worker debris ... are immediately removed and disposed of in an appropriate manner.   No rubbish, trash, garbage, refuse, or other such materials shall be discharged into waters of the State of Alabama.   The permittee is required to perform regular cleanup and proper disposal of floating or submerged trash and garbage.
> 3.  Ensure that appropriate measures are taken to prevent the deposition of airborne pollutants such as spray paint, herbicides, excessive road dust, etc. from entering any waterbody.
> 4.  Ensure that all materials used as fill for construction purposes is non-toxic, non-acid forming and free of solid waste or other debris unless specifically approved by the Department.

Notice of Violation at 3.

*See* Newell Notice of Violation.

Because the notice of violation included the statutorily-requisite invitation to Newell for an informal conference with ADEM before penalties could be imposed and required it to take a number of immediate actions, the court finds that ADEM's action for civil penalties was commenced on the date of that letter, October 12, 2000.  It is undisputed that the plaintiff did not give notice to Newell of its intent to bring a citizen suit under the CWA until November 20, 2000.  Therefore, § 1319(g)(6)(B)(ii) does not limit the bar to plaintiff's CWA claim in the present lawsuit.

### d.    Conclusion

Because Newell was fined and has paid a penalty of $15,000 pursuant to a final, unappealable order issued by ADEM pursuant to a state statute that is comparable to 33 U.S.C. § 1319(g), plaintiff's citizen suit under the Clean Water Act is precluded as to Newell.  Further, this preclusion is not affected by plaintiff's notice of intent to sue Newell under the Clean Water Act because such notice was not provided until after ADEM commenced an action against Newell.  Therefore, summary judgment will be granted in favor of Newell on plaintiff's claim under the Clean Water Act.

**C.   Defendant Jefferson County's Motion to Dismiss**[7]

For the reasons set forth above, the court finds that the plaintiff's lawsuit is barred as to defendant Jefferson County.[8] Both plaintiff and Jefferson County were given an additional opportunity to present evidence and supplemental briefs and were specifically asked by the court to address in their submissions the question of whether § 1319(g)(6)(A)(ii) or (iii) serve as a preemptive defense in this case. While neither party filed an additional brief, defendant Jefferson County filed supplemental evidence that bears directly on the question of whether § 1319(g)(6)(A)(iii) serves to deprive this court of subject matter jurisdiction in this case.

Because most of the facts are similar between the situations presented by ADEM's enforcement action against defendants Newell and Jefferson County, and for the reasons set forth in section IV. B. 2. a. of this memorandum, the court finds without hesitation that the consent order defendant Jefferson County entered into with ADEM is a final order as contemplated by § 1319(g)(6)(A)(iii). Further, as is the case with defendant Newell, the

---

[7] On September 19, 2001, the court, recognizing that the parties may wish to file further evidence in support of or in opposition to the motions to dismiss filed by defendants Barber and Jefferson County, entered two separate orders. The first order (Doc. # 50) ordered defendant Barber and the plaintiff to file additional evidence and supplemental briefs by October 3, 2001, addressing, *inter alia*, whether Barber is a "discharger" as contemplated by the Clean Water Act. The second order (Doc. # 51) ordered defendant Jefferson County and the plaintiff to file additional evidence and supplemental briefs by October 3, 2001, addressing, *inter alia*, whether Jefferson County has a valid defense to plaintiff's Clean Water Act claim under 33 U.S.C. § 1319(g)(6)(A)(ii) or (iii). Both defendants filed supplemental material. Plaintiff filed a motion to extend the deadline by which to file supplemental material. The sole ground of this motion was to allow plaintiff an opportunity to inspect the Site. The court denied this motion because (1) plaintiff had already had several months in which to obtain this inspection, and (2) as discussed herein, the issue of diligent prosecution, the only reason for which plaintiff wanted to inspect the Site, was not determinative of the resolution of this action.

[8] Several courts have found, and this court agrees, that a motion to dismiss for lack of subject matter jurisdiction is an appropriate mechanism by which to challenge a plaintiff's citizen suit as preempted by 33 U.S.C. § 1319(g)(6)(A). *See, e.g., Knee Deep Cattle Co., Inc. v. Bindana Inv. Co. Ltd.*, 94 F.3d 514, 516 (9th Cir. 1996); *Community of Cambridge Env. Health & Community Development Group v. City of Cambridge*, 115 F. Supp. 2d 550, 554 (D. Md. 2000).

state statute under which ADEM assessed defendant Jefferson County $15,000, Ala. Code § 22-22A-5(18), is comparable to 33 U.S.C. § 1319(g) for the reasons stated in section IV. B. 2. b. Finally, ADEM issued a Notice of Violation to Jefferson County on October 12, 2000, that is similar in nature and content to the Notice of Violation issued to Newell. *Compare* Newell Notice of Violation *with* Jefferson County Notice of Violation. Particularly, the letter informed Jefferson County that ADEM intended to pursue a formal enforcement action against it, including the imposition of monetary penalties. Jefferson County Notice of Violation. Importantly, the Notice of Violation also requires Jefferson County to contact the Birmingham Branch Office of ADEM to schedule a meeting to discuss the enforcement action. *Id.* For the reasons stated in section IV. B. 2. c., the Notice of Violation that ADEM provided to defendant Jefferson County commenced its action against Jefferson County pursuant to the relevant Alabama statute, Ala. Code § 22-22A-5(18). Because the Notice of Violation was issued October 12, 2000, ADEM's action was commenced prior to plaintiff's notice of intent to sue, rendering 33 U.S.C. § 1319(g)(6)(B)(ii) inapplicable as a limit to § 1319(g)(6)(A)(iii)'s bar to the present suit. Thus, Jefferson County's motion to dismiss will be granted.

### D.    Defendant Barber's Motion to Dismiss.[9]

Defendant Barber's participation in this lawsuit stems from the fact that it leases the property at which Newell and Jefferson County performed the work that led to the offending discharges at issue in this case. It is undisputed that Barber hired Newell to perform the excavation work at the site. Further, Barber has presented evidence that plaintiff has failed

---

[9]*See supra*, note 7.

to rebut that Barber performed no action whatsoever on the property that led to the pollution about which plaintiff complains.  Put simply, Barber hired Newell to perform certain work. Newell obtained the necessary federal permits to perform that work, and ADEM subsequently determined that Newell violated the Alabama Water Pollution Control Act.  As a result of said violation, Newell was fined and required to take mitigating actions.

Plaintiff argues that by virtue of owning or leasing the property at issue in this case, Barber should be subject to a citizen suit under the Clean Water Act for the violations for which Newell and Jefferson County have already been penalized.  Barber, on the other hand, argues that, as to Newell's violations of the CWA, it cannot be subject to a citizen suit because it neither performed the offending acts that gave rise to the lawsuit nor had any control over Newell, who it had hired as an independent contractor to perform the work that gave rise to discharges that are the subject of this lawsuit.  The regulations promulgated under the Clean Water Act state that "[w]hen a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit."  40 C.F.R. § 122.21(b).  "Operator" is defined by the relevant Alabama Administrative Code provisions as "the person who treats and discharges wastewater or in the absence of treatment the person who generates and/or discharges wastewater, sludge, or storm water." ALA. ADMIN. CODE r. 335-6-6.02(ff) (2001).  Implicitly, then, Barber, which, at best, could be considered owner rather than operator, was under no obligation to seek a permit in the present case.

Neither party has been particularly helpful in providing relevant authority to the court

in support of their respective positions.[10]  While there is some case law indicating that both

the owner of land and its contractor can be liable for violations of the Clean Water Act, such

case law is easily distinguishable from the present case. *See United States v. Lambert*, 945

F. Supp. 797 (S.D. W. Va. 1996) (owner's estate held liable for violation of Clean Water Act

when owner's contractor exceeded limits of permit that owner himself had obtained for the

construction work); *United States v. Board of Trustees of Fla. Keys Community College*,

531 F. Supp. 267 (S.D. Fla. 1981) (holding that both the owner and the contractor can be held

liable for commencing work prior to obtaining a permit for that work).  Plaintiff has failed

to cite the court to any authority that even arguably supports the proposition that a citizen

is entitled to maintain a citizen suit under the Clean Water Act against the lessee of property

when that lessee hires a third party to perform work on the leased premises and the third

party violates the permit that the third party obtained for such work and is subsequently

sanctioned by the state environmental agency for such violation.  Moreover, to subject the

lessee to a citizen suit in such a case does little to further the objectives of the Clean Water

Act, especially when the state administrative agency charged with enforcing the

contractor's permit has investigated the site and made a determination that the contractor

is liable for the violations of the permit and has required the contractor to take immediate

steps to correct the violation and pay $15,000 in penalties.  Without anything more from the

plaintiff than a conclusory argument that Barber should be held liable simply for leasing the

premises on which Newell violated the permit that Newell itself obtained for the work that

---

[10]Plaintiff argues that liability under the Clean Water Act is strict and that the Act does not require fault
to support the award of civil penalties.  While this may be so, it does not support the proposition that the lessee
of property can be liable for discharges caused by others, who are subsequently punished for those discharges.

led to said violation, the court will not second-guess ADEM's implicit determination that Newell was solely liable for the violations of its permit.

As to Jefferson County's violations, the case is even stronger that plaintiff should not be able to maintain a citizen suit as to Barber. Beyond the fact that, again, plaintiff has failed to put forth persuasive authority for the proposition that Barber should be treated as a discharger for purposes of liability when the evidence shows that Jefferson County, and not Barber, committed the violations for which it was punished, two additional facts are made clear by the affidavits that Barber submitted. First, the work that Jefferson County was performing at the site was the result of an economic incentive offered to Barber by the County; Barber did not hire the County to perform the work at the site. Second, Barber had absolutely no control over the work that Jefferson County performed at the site. (*See* Ray Aff. at ¶¶15-20; Sullivan Aff. at ¶¶3-6.) Because liability under the Act can be premised only on actual performance of the offending work or control over performance of that work, *see United States v. Board of Trustees of Fla. Keys Community College*, 531 F. Supp. 267, 274 (S.D. Fla. 1981), Barber cannot be liable for Jefferson County's violation of the Clean Water Act. Moreover, ADEM has refused to cite Barber for violations of the Clean Water Act or comparable state environmental regulations for the discharges caused by Jefferson County and Newell, even though it inspected the leased premises on numerous occasions and presumably had ample opportunity to do so. The court finds this refusal to constitute an implicit determination by ADEM that Barber is not a proper party to any enforcement and penalty actions for Jefferson County's and Newell's violations, the only violations of which there is any evidence in the record. Again, this court will not second-guess ADEM's

determination in this case.

**E.      Supplemental Jurisdiction of State Law Claims.**

Because the court will dismiss all of plaintiff's federal claims under the Clean Water Act, leaving only state law claims, the court will dismiss those state law claims pursuant to 28 U.S.C. § 1367(c)(3) without prejudice.

**V.    Conclusion.**

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this _____*19*_____ of  October, 2001.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE